**In re Robert Eugene HOWARD and Callie Stewart Howard, Debtors.**

**Bankruptcy No. 96–22512.**

United States Bankruptcy Court, E.D. Tennessee.

July 15, 1997.

Dean Greer, Kingsport, TN, for Robert and Callie Howard.

Norman B. Jackson, Knoxville, TN, for Associates Financial Services Company, Inc.

Jerry W. Laughlin, Rogers, Laughlin, Nunnally, Hood & Crum, Greeneville, TN, for Consumer Credit Union.

N. David Roberts, Bailey, Roberts & Bailey, P.L.L.C., Knoxville, TN, for C. Kenneth Still, Chapter 12 Trustee.

## MEMORANDUM

MARCIA PHILLIPS PARSONS,
Bankruptcy Judge.

This chapter 12 case came before the court on May 13, 1997, for a hearing on confirmation of the debtors' proposed second plan of reorganization and the objections thereto filed by C. Kenneth Still, the chapter 12 trustee (the "Trustee"), Associates Financial Services Company, Inc. ("Associates"), and Consumer Credit Union ("Consumer").[1] For the reasons set forth below, the objections of Consumer will be sustained in their entirety, and the objections of Associates and the Trustee will be overruled except with respect to their objection as to feasibility over the long-term of the plan. Confirmation of the debtors' proposed second plan of reorganization will be denied. This is a core proceeding. See 28 U.S.C. § 157(b)(2)(L).

### I.

The petition initiating this chapter 12 case was filed on November 4, 1996. The debtors, Robert and Callie Howard, live on and operate a 79 acre dairy and tobacco farm located outside of Jonesborough, Tennessee. Living on the farm with the debtors are their two adult sons, Donald and Robert Howard, ages 23 and 29 respectively, both of whom work on the farm full time. The debtors purchased the farm from Mr. Howard's mother in 1987 for a purchase price of $35,000.00 when she moved to a nursing home, although the debtors had lived on and worked the farm for a significant period of time before then and the farm had been in the family for over 50 years.

The purchase of the farm was the beginning of the debtors' financial troubles. The debtors borrowed the $35,000.00 from a local bank and continued to borrow additional sums to support Mr. Howard's mother in the nursing home. In April 1990, Mrs. Howard was forced to take early retirement from her job at Sprint United Telephone where she had worked for 30 years. Mrs. Howard's income was reduced from in excess of $28,-000.00 per year to a monthly pension of $321.00. Mrs. Howard did not obtain new employment until three years later when she began working 30–35 hours a week at Maytag for $4.95 an hour.

In order to repay their bank loans, the debtors borrowed $70,000.00 from Associates in 1990, giving Associates a first deed of trust on the farm as security for the debt. In 1992, the debtors sold a right of way on their farm for $30,000.00 to the local power company. According to Mr. Howard, Associates demanded $15,000.00 of the proceeds and then refinanced the debt to account for the lump sum payment. After a loan fee charge of $10,504.56, a credit life insurance premium of $8,030.00, and appraisal and title examination fees, the debtors were deeper in debt notwithstanding their lump sum payment. The new promissory note was in the principal amount of $115,550.25.[2]

The debtors' losses continued to mount. In 1993, the debtors' tobacco crop was severely damaged by a hail and wind storm and the insurance company refused compensation, resulting in a loss of over $25,000.00. In 1994, a severe summer drought destroyed the debtors' entire tobacco crop, and in August of that year, a wind storm blew down

---

1. Objections to confirmation were also filed by Superior Financial Services ("Superior") and an individual claimant, G.T. Bacon, who appeared *pro se*. At the beginning of the confirmation hearing, counsel for Superior and the debtors announced that Superior's objection had been resolved and the debtors would be amending their plan to reflect the parties' agreement. Mr. Bacon did not appear at the confirmation hearing to pursue his objection and, accordingly, his objection to confirmation will be overruled. The court notes that Mr. Bacon's objection may have been resolved in part by the debtors' proposed second plan. The basis of Mr. Bacon's objection was that he was owed $2,022.50 rather than $1,500.00 as scheduled by the debtors. Further-

more, he asserted that the debtors' plan was not feasible. After the filing of the objection, the debtors filed their second plan of reorganization which proposed to pay Mr. Bacon the sum of $2,022.50 plus 6% interest.

2. Included within the principal amount of the promissory note was new money of $5,906.00 provided to the debtors and $707.12 paid to the Washington County Tax Assessor. The note also indicated that $84,821.01 and $4,737.47 of the loan amount were used to repay the debtors' previous accounts. Presumably, the debtors had borrowed other sums after the initial $70,000.00 loan.

their barn, which in Mr. Howard's opinion, resulted in the death of 30 head of cattle from weather exposure in the following winter. Milk prices also declined during this period of time. By the end of 1995, the debtors were behind in their payments to Associates and their other creditors including Johnson City Chemical Company which had levied on their 1995 tobacco sale proceeds. Disheartened, the debtors virtually ceased farming in 1996; they planted only one and one-half acres of tobacco and let their dairy cows go dry.

Because of the debtors' default in their payments, Associates initiated foreclosure proceedings on the farm, scheduling a sale for June 1996. The debtors consulted various attorneys for guidance and on June 6, 1996, commenced their first chapter 12 case.[3] This case was dismissed on October 15, 1996, after the debtors failed to propose a plan of reorganization within 90 days as required by 11 U.S.C. § 1221. When Associates subsequently recommenced foreclosure proceedings, the debtors retained counsel and filed the present chapter 12 case on November 4, 1996. Associates and the Trustee immediately moved jointly to dismiss the case, asserting lack of good faith, an inability to reorganize, a prohibition on filing under 11 U.S.C. § 109(g)(1), and chapter 12 ineligibility because the debtors were allegedly not family farmers with regular annual income. After a full evidentiary hearing on February 18, 1997, the joint motion was denied in all respects.

The debtors' proposed second[4] plan of reorganization was filed on April 15, 1997. The plan divides the claims of creditors into eight classes. Class One consists of all allowed expenses of administration, including up to $8,000.00 of postpetition credit for planting supplies, which are to be paid out of the proceeds from this year's tobacco crop. Class Two has only one claim, that of the

local property taxing authority. The debtors' real property taxes for 1992–1996 plus 6% interest will be paid in five annual installments commencing January 1998.

Class Three is Associates' claim in the amount of $118,954.33[5] secured by a lien on the debtors' real property, which in the debtors' estimation is worth $300,000.00. The debtors assert that they have claims against Associates which they will seek to offset against Associates' claim. Any sum remaining owed will be paid with 9% interest in twenty equal annual installments beginning January 1998. If no offset is permitted, annual payments of $12,847.07 will be necessary to pay the claim in full with interest.

Class Four is the claim of Consumer in the amount of $39,653.12 which is secured by a lien on the debtors' cattle and various pieces of equipment owned by the debtors, all of which are valued collectively by the debtors at $37,600.00. The debtors propose to pay Consumer in full with 9% interest in a combination of monthly and annual payments over the next ten years. Monthly payments will be $150.00 per month in 1997 beginning in June 1997, $200.00 a month in 1998 and $250.00 per month thereafter. Annual installments will commence in January 1998 when 5% of the original principal plus interest of $4,502.00 will be paid; thereafter, annual payments of 10% of the principal will be made each year through January 2007.

Class Five, as presently proposed, comprises two claims held by Superior Financial Services: one in the amount of $6,142.15 secured by a lien on various personalty worth $3,780.00 and the second in the amount of $5,229.66 secured by two trucks and a trailer valued collectively at $5,200.00. Both the secured portion of the first claim and the entire second claim will be paid in full plus 9% interest in five equal annual installments starting in January 1998. The unsecured

---

3. This bankruptcy petition was filed by the debtors *pro se* although an attorney consulted by them helped prepare the petition and accompanying schedules and statement.

4. In response to objections to confirmation filed by Associates, the Trustee, Consumer, Superior and G.T. Bacon, the debtors withdrew their first

plan of reorganization conceding that it did not meet certain confirmation requirements.

5. This is the amount claimed in the proof of claim filed by Associates on January 2, 1997. After the confirmation hearing, Associates amended its claim to $123,360.58 to include additional attorney fees.

portion of the first claim will be paid with the unsecured debts in Class Seven.[6]

Class Six is the claim of United Southeast Federal Credit Union in the amount of $3,396.00 secured by the debtors' 1988 Chevrolet Corsica valued at $2,500.00. The secured value plus 9% interest will be paid in 48 monthly payments of $62.23 commencing June 1997, with the unsecured portion of the claim paid in accordance with the provision for unsecured debts in Class Seven.

Allowed unsecured debts, estimated at $24,686.00, comprise Class Seven and will be paid in full plus 6% interest in five annual installments with 10% of the debt to be paid in January 1998, 15% in January 1999, 20% in January 2000, 25% in January 2001, and 30% in January 2002.

Associates, the Trustee, and Consumer have all filed objections to this proposed second plan. Associates objects to the 9% interest rate the debtors have offered, maintaining that it is entitled to its contract rate of interest of 14.05%. Both Associates and the Trustee contend that the debtors' plan is not feasible and Consumer objects to the low monthly payment it will receive, noting that the debtors will be funding their plan to a great extent with monies derived from the use of its collateral, the cattle and farming equipment. The court will address each of these objections in turn.

## II.

■ As stated above, Associates holds a first deed of trust securing the real property on which the debtors reside and farm. Associates is undeniably oversecured. According to its most recent proof of claim, Associates is owed $123,360.58 and the debtors have valued its collateral at $300,000.00, a valuation which has not been disputed. Associates contends that it is entitled to its contract rate of interest of 14.05%. It concedes, however, that if the court were to find that it is only entitled to the current market rate of interest, the 9% rate proposed by the debtors meets that requirement.

In support of its argument that the debtors can not "cramdown"[7] its interest rate, Associates cites the Sixth Circuit Court of Appeals cases of *U.S. v. Arnold,* 878 F.2d 925 (6th Cir.1989), *reh'g denied* (1989), *Cardinal Federal Savings & Loan Ass'n v. Colegrove (In re Colegrove),* 771 F.2d 119 (6th Cir. 1985), and *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982). In *Memphis Bank & Trust,* the first of these cases, the court held that when a creditor is forced to write down its secured claim to the value of its collateral in a chapter 13 plan, the creditor is entitled to the current market rate of interest because it is in effect making a new loan to the debtor in the amount of the current value of the collateral. *Id.* at 431.

In *In re Colegrove,* the court held that a debtor must pay interest on a mortgage arrearage when curing a mortgage default through a chapter 13 plan.[8] "A contrary

---

**6.** The proposed treatment of Superior's claims set forth in the body of this opinion is that contained in the second plan of reorganization, rather than the compromise reached by the debtors and Superior in resolving Superior's objection to confirmation. Under the agreement announced by the parties, Superior will be paid as a fully secured creditor plus 12% interest in annual installments. Because the effect of this change on the overall mathematics of the debtors' second proposed plan was not presented, the court will consider the present plan as filed for purposes of this opinion.

**7.** In *In re Young,* 199 B.R. 643 n. 1 (Bankr. E.D.Tenn.1996), this court cited *U.S. v. Arnold (In re Arnold),* 878 F.2d 925, 928 (6th Cir.1989), *reh'g denied* (1989), for the proposition that the forced "write down" of an undersecured claim to the value of its collateral under 11 U.S.C. §§ 1325(a)(5)(B) and 506(a) is sometimes referred to as a "cramdown." The term "cramdown" is not limited to a write down of an undersecured debt, but includes all occasions where a reorganization plan is forced on an unwilling secured creditor under 11 U.S.C. §§ 1129(b)(2)(A), 1225(a)(5)(B), or 1325(a)(5)(B).

**8.** The Sixth Circuit in *Colegrove* and later the U.S. Supreme Court in *Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), held that interest must be paid on mortgage arrearages even if not required by the underlying contract or prohibited by state law. These rulings were overruled prospectively by the enactment of 11 U.S.C. § 1322(e) on October 22, 1994, which provides that with respect to mortgages entered into after the enactment date, the only interest that must be paid to cure a plan default is that which is permitted by both the contract and applicable nonbankruptcy law. *See*

conclusion would prevent the creditor from realizing the full present value of the amount owed," stated the court. *In re Colegrove,* 771 F.2d at 121. The *Colegrove* court concluded that the appropriate rate of interest was the prevailing market rate with the contract rate as an upper limit. *Id.* at 123.

In *Arnold,* the Sixth Circuit held that an undersecured creditor forced to write down its claim to the value of its collateral in a chapter 12 plan was entitled to a current market rate of interest, even if this rate exceeds the underlying contract rate. *Arnold,* 878 F.2d at 930. Associates asserts that while none of these three cases are precisely on point,[9] their collective reasoning support the proposition that in a chapter 12 or 13 case,[10] the interest rate of a fully secured creditor can not be crammed down because to do so would improperly deprive it of the full benefit of its contractual agreement.

Resolution of this issue requires a discussion of the interplay of two Bankruptcy Code provisions, 11 U.S.C. §§ 1225(a)(5) and 506(b). Section 1225(a) sets forth the requirements for confirmation of a chapter 12 plan, with the treatment of secured claims being governed by subsection (a)(5).[11] Under this subsection, the proposed plan can be confirmed if one of three conditions is satisfied: the creditor accepts the plan, the debtor surrenders the property securing the claim to the creditor, or the debtor invokes

the so-called "cramdown" power. *See Associates Commercial Corporation v. Rash,* ── U.S. ──, ── ── ──, 117 S.Ct. 1879, 1881–83, 138 L.Ed.2d 148 (1997). The cramdown option permits the debtor to keep the collateral over the objection of the creditor as long as the creditor retains the lien securing its claim and is paid the amount of its allowed secured claim as of the effective date of the plan. *Id.* Since typically, as in the present case, the plan does not provide for payment of this amount in a lump sum at confirmation but rather in deferred installments over the life of the plan, the stream of future payments must be discounted to present value to insure that the creditor is not receiving less than the allowed amount of its secured claim. *See In re Young,* 199 B.R. at 648. As the Sixth Circuit noted in *Arnold:*

> [W]e held in *Memphis Bank* that as this amount will not be paid immediately, interest should be assessed on the amount which the debtor will repay to compensate the creditor for the use of his or her money. We explained "[s]ection 1325(a)(5)(B) seems to require the Bankruptcy Court to assess interest on the secured claim for the present value of the collateral (if it is not paid immediately) in order not to dilute the value of that claim through delay in payment."

*Arnold,* 878 F.2d at 928 (quoting *Memphis Bank & Trust,* 692 F.2d at 429). Although in

---

8 COLLIER ON BANKRUPTCY ¶ 1322.09[4] (15th ed. rev.1997).

**9.** Both *Memphis Bank & Trust* and *Arnold* involved the appropriate rate of interest for an undersecured creditor forced to write down its claim to the value of its collateral in a reorganization plan. Although *In re Colegrove* concerned an oversecured creditor, as in the instant case, the precise issue before the court was whether a chapter 13 plan must provide for the payment of interest on a mortgage arrearage and if so, at what rate. Furthermore, the mortgage holder in *Colegrove* was protected by 11 U.S.C. § 1322(b)(2) which prohibits modification of a debt secured solely by the debtor's principal residence. *See Arnold,* 878 F.2d at 929 n. 3. There is no provision in chapter 12 providing similar protection.

**10.** Numerous courts, including the Sixth Circuit Court of Appeals, have uniformly noted that because 11 U.S.C. §§ 1225(a)(5) and 1325(a)(5) are

virtually identical, they should be similarly construed. *See* 8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][c] n. 23 (15th ed. rev.1997); *Arnold,* 878 F.2d at 928.

**11.** 11 U.S.C. § 1225(a)(5) states:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
> . . .
> (5) with respect to each allowed secured claim provided for by the plan—
> (A) the holder of such claim has accepted the plan;
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
> (C) the debtor surrenders the property securing such claim to such holder; . . . .

actuality the rate to be determined is a discount rate rather than a true interest rate, courts and litigants usually speak in terms of interest rate because the easiest way to determine present value for purposes of § 1225(a)(5)(B)(ii) [and § 1325(a)(5)(B)(ii) ] is to ascertain the allowed amount of the secured claim and then apply to that amount an appropriate interest rate to ensure that the present value of payments to the secured creditor will at least equal the allowed amount of the secured claim. *See* 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 5.50 (2d ed. 1994).

The first step in determining whether the debtors' proposal with respect to Associates meets the cramdown requirements of § 1225(a)(5)(B) is to establish the amount of Associates' allowed secured claim as of the effective date of the plan. *See In re Young,* 199 B.R. at 648, 8 COLLIER ON BANKRUPTCY ¶ 1225.03[2] (15th ed. rev.1997). This amount is determined by reference to § 506 of the Bankruptcy Code. *Id.* With respect to oversecured claims, § 506(b) provides that the amount of a secured claim includes "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." [12]

■ The majority of courts hold that the interest allowed to an oversecured creditor under § 506(b) is the contract rate. *See In re Foertsch,* 167 B.R. 555, 561 (Bankr. D.N.D.1994), and authorities cited therein. This contract interest, however, accrues only until the effective date of the plan. *See Rake v. Wade,* 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993) ("[Section] 506(b) applies only from the date of filing through the confirmation date."); *In re DeMaggio,* 175 B.R. 144, 147 (Bankr.D.N.H. 1994) ("It needs to be emphasized that the § 506(b) issue deals only with the question of accrual of postpetition interest from the date of the chapter 13 filing to the effective date of a confirmed plan."); *In re Wilmsmeyer,* 171 B.R. 61, 63 (Bankr.E.D.Mo.1994) (contract rate accrues to the effective date, at

which time the interest is added to the prepetition claim and the creditor thereafter receives the present value of that amount); *In re Foertsch,* 167 B.R. at 561 ("In determining the 'amount' of postpetition interest under § 506(b) only, this court follows the view of the majority courts which hold that such interest should be computed at the 'contract rate' under which the claim arose up to the point where the aggregate claim equals the value of the security. [Citations omitted.] Thereafter, the market rate of interest is generally the benchmark by which postpetition interest becomes payable under a plan of reorganization.").

■ Once the allowed amount of the secured claim as of the effective date of the plan has been established by reference to § 506(b), § 1225(a)(5)(B)(ii) requires that an appropriate interest rate be applied to that amount to ensure that the installments paid to the creditor over the life of the plan are not less than the present value of the allowed secured claim. The reason for paying interest under § 1225(a)(5)(B)(ii) is to guarantee that the creditor receives the present value of its secured claim, not because of any underlying contractual obligation. *See In re DeMaggio,* 175 B.R. at 150. As explained by the *DeMaggio* court:

> Although § 506(b) and § 1335(a)(5)(B)(ii) both mandate a calculation of interest, there are different objectives underlying the actual selection of the interest rate under each section. As a result, the interest rate that will return the present value under the plan under § 1325(a)(5)(B)(ii) is not necessarily the same interest rate used to determine the allowed amount of the claim under § 506(b). While § 506(b) determines the exact amount of the claim as of the "effective date of the plan," § 1325(a)(5)(B)(ii) requires the payments made under the plan return the present value of that amount to the creditor. The two sections complement each other and

---

**12.** 11 U.S.C. § 506(b) provides in its entirety that "[t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there

shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

together ensure the full payment of the value of the secured creditor's claim.

*Id.* at 150 (citations omitted). *See also In re Foertsch,* 167 B.R. at 561; *Lenz v. Fed. Land Bank of St. Louis (In re Lenz),* 74 B.R. 413, 416 (Bankr.C.D.Ill.1987).

In both *Memphis Bank & Trust* and *Arnold,* the Sixth Circuit Court of Appeals made clear that the appropriate interest rate to ensure payment of the present value of the creditor's secured claim is current market rate, not contract rate. *See In re Arnold,* 878 F.2d at 929–930; *Memphis Bank & Trust,* 692 F.2d at 429. *See also* 8 COLLIER ON BANKRUPTCY ¶ 1325.06[3][b][iii][B] (15th ed. rev.1997) (noting that during the legislative process leading to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress specifically considered and rejected an amendment requiring payment of a contract rate of interest under § 1325(a)(5)(B)(ii)). The fact that *Arnold* involved an undersecured creditor rather than an oversecured creditor does not change this analysis.[13] In both cases the creditor is being forced in effect to make a new loan to the debtor at the time of confirmation. The only difference is the amount of the new loan: for an undersecured creditor this amount is the value of its collateral, for an oversecured creditor the new loan is the amount of the creditor's allowed claim as of the effective date of the plan. Nothing in *In re Colegrove* changes this result. As noted in *Arnold,* the court in *Colegrove* held that the payment of interest on an mortgage arrearage was required or "the creditor would be deprived of the full present value of the amount it was owed." *See Arnold,* 878 F.2d at 929 (citing

*In re Colegrove,* 771 F.2d at 122). Paying Associates a current market rate of interest rather than contract interest on its allowed secured claim does not deprive it "of the present value of the amount it [is] owed," but, as *Arnold* made clear, ensures that it will be paid the full present value of its secured claim over the life of the plan. Associates having conceded that the 9% rate proposed by the debtors is the current market rate, Associates' objection to the interest rate that it will be paid under the plan will be overruled.[14]

■ Associates also continues to object to the debtors' eligibility for chapter 12 relief even though the court previously ruled against Associates on this issue in denying Associates' motion to dismiss. Associates contends that the term "family farmer" as defined in 11 U.S.C. § 101(18) does not include emancipated children of a debtor and that the debtors are not "family farmers with regular annual income" because in order for their plan to succeed they must rely on the labor and assets of third parties (the debtors' sons). Associates is referring to the fact that the debtors' two adult sons live on and work the farm, that the debtors' son Robert owns nineteen of the dairy cattle on which the debtors will depend for their milk production, and that the debtors will be growing five out of their planned twenty acres of tobacco on real property leased to Robert rather than the debtors.

Both the debtors and their sons testified that all of their efforts and assets go into the debtors' farm operations in order to meet farm expenses and that this will continue throughout the chapter 12 plan. The sons

---

**13.** Regrettably, the court in *Arnold* did state that when a cramdown occurs under § 1225(a)(5)(B) **and** a creditor is forced to write down a portion of its note, it is entitled to receive its current market rate on the "new loan," implying that only when both of these circumstances are present is the creditor to be paid the market rate. *See Arnold,* 878 F.2d at 930. However, such a limited construction is not supported by the Code or the analysis of this issue found in both *Memphis Bank & Trust* and *Arnold.* In the absence of any other authority for the proposition that an oversecured creditor is entitled to contract interest throughout the life of the plan, the court does not find this statement in *Arnold* to be determinative.

**14.** The debtors' proposed plan is defective since it provides only for payment of Associates' claim as of the date of filing rather than its allowed secured claim as of the effective date of the plan. Because the allowed amount of an oversecured claim includes interest, fees, costs, and charges arising between the petition date and the effective date of the plan, a plan should provide that all such amounts are capitalized and added to the principal amount and thereafter paid in the same manner as the prepetition portion of the claim. 8 COLLIER ON BANKRUPTCY ¶ 1225.03[2] (15th ed. rev.1997).

work on the farm full-time without regular earnings in return for their room and board and occasional spending money. Both testified that they are willing to do this in order to keep the farm and in expectation that the farm will some day belong to them.

11 U.S.C. § 109(f) provides that "[o]nly a family farmer with regular annual income may be a debtor under Chapter 12...." 11 U.S.C. § 101(19) defines "family farmer with regular annual income" as a "family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12...." Included in the definition of "family farmer" under 11 U.S.C. § 101(18) is an "individual or individual and spouse engaged in a farming operation...."[15] Associates points to this definition in support of its argument that emancipated children cannot be debtors because § 101(18) is limited to an individual and his or her spouse. The sons, however, have not filed for chapter 12 relief, only Mr. and Mrs. Howard. Nor is it necessary for the sons to be debtors in order for their assets and labor to be utilized by the debtors under their plan. Section 101(18) does not require debtors to only use assets belonging to them; instead the debtors only have to be "engaged in a farming operation" as long as the other requirements for a family farmer are met. "Farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock in an unmanufactured state." 11 U.S.C. § 101(21). Undoubtedly, the debtors in the instant case who dairy farm, have beef cattle, and raise tobacco are engaged in farming operations, even though they have no ownership interest in some of the dairy cattle and a section of the land on which they will grow tobacco. *See In re Voelker,* 123 B.R. 749 (Bankr.E.D.Mich.1990) (chapter 12 debtor operated farm, even though he had only minor ownership interest, where debtor and owner, his son, jointly managed all phases of farm operation and debtor actually performed his fair share of physical labor in implementing those management decisions). *See also In re Land,* 82 B.R. 572 (Bankr.D.Colo.1988), *aff'd,* 96 B.R. 310 (D.Colo.1988) (debtor's filing of chapter 12 to forestall foreclosure in order to reorganize farm so it could be passed on to his son did not constitute bad-faith motive so as to preclude confirmation of chapter 12 plan); *In re Easton,* 79 B.R. 836 (Bankr.N.D.Iowa 1987), *aff'd,* 104 B.R. 111 (N.D.Iowa 1988), *vacated,* 883 F.2d 630 (8th Cir.1989), *on remand,* 118 B.R. 676 (Bankr.N.D.Iowa 1990) (elderly chapter 12 debtors engaged in the process of transferring their farm from one generation to the next are "family farmers" even though they have substantially retired from active farming where they continue to reside upon the farm itself, conduct limited farming operations, and cash rent part of their farm real estate to a family member).

---

**15.** 11 U.S.C. 101(18) in its entirety provides that "family farmer" means—

(A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed; or

(B) corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of the members of such family, and such family or such relatives conduct the farming operation, and

(i) more than 80 percent of the value of its assets consists of assets related to the farming operation;

(ii) its aggregate debts do not exceed $1,500,000 and not less than 80 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and

(iii) if such corporation issues stock, such stock is not publicly traded.

Contrary to Associates' assertion that Mr. and Mrs. Howard are not "family farmers" eligible for chapter 12 relief, the debtors are the classic family farmers for which chapter 12 relief was designed. *See In re Welch,* 74 B.R. 401, 405 (Bankr.S.D.Ohio 1987) (To hold that couple who had engaged in dairy and grain farming, operated their farming operation on their jointly owned land for nearly fifteen years, and suffered the severe financial distress common to many farmers was anything other than a "family farmer" because debtors "farmed out" some of the milking and much of the grain production "would be a travesty upon and a trampling of the intention of Congress as defined by the legislative history of the chapter 12 legislation."). Accordingly, Associates' objection in this regard will also be overruled.

### III.

Before addressing the feasibility objection raised by both Associates and the Trustee, the court will consider the objections raised by Consumer. As set forth previously, Consumer challenges the fairness of the payment proposal offered by the debtors with respect to its claim. Consumer notes that until the debtors' crops are harvested in late fall, the debtors' farm income will be derived solely from the use of Consumer's collateral. Based on the debtors' projections for 1997, the debtors will receive $29,000.00 from milk sales and $8,250.00 from the sale of calves and steers this year, yet will pay Consumer only $900.00 during 1997 ($150.00 per month from June through December). Consumer asserts that it will be bearing the burden and risk of the debtors' reorganization while the debtors' payments to it in 1997 and 1998 will not even cover accruing interest.

Consumer also questions the adequacy of its lien protection, observing that there is nothing in the plan prohibiting the debtors from selling the cattle on which Consumer has a lien. At the confirmation hearing, Mr. Howard testified that he was entitled to sell any cattle not originally included in Consumer's collateral and that during the pendency of this case he had sold a bull notwithstanding the court's order of January 28, 1997, enjoining the sale of any cattle without Consumer's consent or court authorization.

In response, the debtors assert that Consumer has failed to come forward with any proof as to why the monthly payments are not satisfactory or which would indicate that Consumer's collateral is declining in value in excess of the proposed plan payments. The debtors contend that in the absence of such proof and of any indication as to what amount would constitute an adequate and fair payment, Consumer's objection cannot be sustained because the requirements of § 1225(a)(5)(B) have been met: Consumer's claim is being paid in full, with an appropriate rate of interest. Furthermore, the debtors maintain that rather than falling in value, Consumer's collateral is increasing in value due to the birth of additional cattle. At the confirmation hearing, Mr. Howard testified that his beef cattle herd had increased since the hearing before this court in February 1997.

As counsel for Consumer conceded in closing argument, the chapter 12 confirmation requirements do not include a "fairness" component *per se.* Nevertheless, a few courts have imposed such a requirement in determining whether a chapter 12 plan should be confirmed. *See Farmers Home Admin. v. Fisher (In re Fisher),* 930 F.2d 1361, 1362 (8th Cir.1991) ("Congress enacted 11 U.S.C. § 1225(a)(5)(B) to insure that creditors ... 'receive a fair repayment.' "); *Matter of Rose,* 135 B.R. 603, 604 n. 3 (Bankr. N.D.Ind.1991) ("[T]he court finds that [creditor's] argument that the debtors' plan unfairly treats his secured claim ... [is] appropriate in the context of this chapter 12 case."); *In re Koch,* 131 B.R. 128, 130–131 (Bankr. N.D.Iowa 1991) (court considered whether length of repayment under the plan insured the creditor a "fair repayment"); *Matter of Pianowski,* 92 B.R. 225, 234 (Bankr. W.D.Mich.1988) (creditor's right to receive "fair repayment of its indebtedness" a factor in determining whether a chapter 12 debtor could make direct payments to creditor).

In most instances, these courts derived the fairness requirement from the legislative history to chapter 12 which explains that chapter 12 "offers farm families the important

protection from creditors that bankruptcy provides while at the same time preventing abuse of the system and insuring that farm lenders receive a fair repayment." *See, e.g., In re Fisher,* 930 F.2d at 1362 (quoting H.R.REP. No. 958, 99th Cong.2d Sess., 48–49 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5249–5250.) In this court's view, this pronouncement is more a reflection of Congress' belief that the chapter 12 statutory scheme enacted by it will result in fair repayment rather than a directive that the courts undertake a subjective fairness analysis. For the most part, the sole duty of this court is to consider whether the specific, pertinent Code requirements for confirmation have been met; if so, presumably the plan is "fair" in Congress' estimation.

■■■ That being said, this court does not find that the debtor's proposed repayment to Consumer meets the requirements for confirmation found in § 1225(a)(5). Because Consumer has not accepted the plan and the debtors do not propose to surrender Consumer's collateral, the plan must provide for retention of Consumer's lien and payment of the present value of Consumer's allowed secured claim as of the effective date of the plan. *See Rash,* — U.S. at — – —, 117 S.Ct. at 1881–1883. The treatise COLLIER ON BANKRUPTCY notes that the lien retention component is easily satisfied if the property securing the claim is land or equipment, but that a more difficult problem is presented when the claim is secured by livestock. 8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][a] (15th ed. rev.1997). If taken literally, the lien retention language of § 1225(a)(5)(B)(i) would preclude a debtor from selling livestock, using the proceeds in his farming operations, and providing the creditor with substitute collateral. However the few courts having occasion to consider this issue in the context of livestock collateral have concluded that this language "can be interpreted to mean that the livestock lender must retain its lien on the herd rather than on the particular animals that comprise the herd." *See Abbott Bank–Thedford v. Hanna (In re Hanna),* 912 F.2d 945, 949 (8th Cir.1990). "The fact that the particular animals comprising the herd change over time will not matter so long as the creditor retains its lien on the herd

and the value of the creditor's claim can be appropriately protected." *Id.* at 950. *See also* 8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][a] n. 11 (15th ed. rev. 1997) and cases cited therein.

In the present case, the debtors' proposed plan does recite that Consumer's claim is secured with a lien on cattle and certain specified equipment. The plan also provides that "all creditors having valid liens on assets owned by the debtors shall retain their liens until the payments contemplated by the Plan are completed." There are no provisions, however, to insure that Consumer's lien value will be adequately protected over the life of the plan.

■■■ The debtors' assertion that no safeguards are necessary since Consumer has failed to come forward with any evidence that would indicate lack of adequate protection is appropriate with respect to the equipment on which Consumer has a lien. Although a debtor has the ultimate burden of persuasion with respect to each of the elements for confirmation of a chapter 12 plan, the objecting party bears the initial burden of going forward with evidence in support of the objection. *See In re Luchenbill,* 112 B.R. 204, 208 (Bankr.E.D.Mich.1990). Other than testimony that the equipment will be used extensively during the summer months and that repairs will be greater than previously, there was no quantitative evidence as to the rate at which the equipment would depreciate during the life of the plan. Absent this information, this court is unable to conclude that the payments proposed by the debtors are insufficient to provide Consumer adequate protection with respect to the equipment.

With respect to the cattle in which Consumer has a lien, however, substantial evidence was presented which significantly calls into question the sufficiency of the protection afforded Consumer's interest in the cattle. Notwithstanding Mr. Howard's testimony that the lien value of the cattle is adequately protected because of new births, Consumer's interest is at risk. In 1995, the debtors lost 30 head of cattle due to weather exposure after their barn was destroyed by a wind

storm. This barn has not been repaired or replaced so the danger of future additional loss is a real possibility. Furthermore, Mr. Howard's sale of a bull in disregard of this court's injunction on any such sales raises substantial concerns. Finally, although not quantifiable, the nature of livestock is inherently risky.

> Unlike equipment which is not typically sold by the debtor and depreciates only gradually, livestock will be bought and sold during the period of the plan and is subject to drastic and sudden changes in value. Changes in value can arise in three ways: increases or decreases in the animals comprising the herd, changes in the market price of the livestock, and the risk of loss from disease or inadequate care. In considering the appropriate payment schedule for a claim secured by livestock, all of these potential changes in the value of the herd must be addressed. In order to protect the creditor's interest in the herd and to make sure that the creditor is receiving the present value of its claim, the plan must contain the same types of safeguards customarily contained in livestock loans.

8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][b][iii] (15th ed. rev.1997). Because there are no such safeguards in the debtors' plan, the court concludes that Consumer's interest in the debtors' cattle is not adequately protected. As a result, the lien retention requirement of § 1225(a)(5)(B)(i) has not been met. *See In re Hanna*, 912 F.2d at 951.

Fortunately, the courts which have considered the issue of lien retention in livestock have formulated some guidelines for the protection of a creditor's lien during the course of a reorganization. *See* 8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][b][iii] (15th ed. rev.1997) and cases cited therein. First, the plan should set forth a minimum level at which the herd will be maintained. This level should be sufficient to ensure that in the event the debtor defaults on plan payments, the creditor will receive the balance of its claim or the value of the collateral as of

the effective date of the plan, whichever is less. *See In re Hanna*, 912 F.2d at 951.

> The holder of a secured claim is entitled to maintain the economic status quo before and after confirmation of the plan to the extent of the value of its collateral. The value of collateral is at once the source and limit of the secured creditors' right to adequate protection. The interest in collateral to be protected is the creditors' right to realize on the value of its collateral in the event of default.

*Matter of Underwood*, 87 B.R. 594, 598 (Bankr.D.Neb.1988). Second, the creditor should receive frequent and detailed reports of inventory and values and have the right to inspect the herd. *In re Hanna*, 912 F.2d at 951. Third, the plan should specify the terms under which cattle can be sold and if appropriate, prior notice to the creditor of certain types of sales. *Id.*

Of course in order to maintain the value of the cattle throughout the reorganization, it is necessary to know their value. There was no testimony at the confirmation hearing as to the value of the cattle at that time. The debtors' proposed plan values all of Consumer's collateral, including the equipment, at $37,600.00, but does not break down this valuation between equipment and cattle. Other than the debtors' schedules, the only evidence before the court as to the value of the cattle was a list of current livestock attached as *Exhibit B* to the parties' joint pretrial statement filed May 5, 1997. This list sets forth the number and type of cattle, along with their weights and market values which totaled $31,900.00. Accordingly, the court finds this amount to be the value of the cattle as of the effective date of the plan and, thus, the value of cattle to be maintained and protected so that the lien retention requirement of § 1225(a)(5)(B)(i) is met.

The court next turns to the fact that initial payments to Consumer will not even cover accruing interest, thus negatively amortizing Consumer's debt for the first year and a half of the plan.[16] The vast majority of courts considering the appropriateness of

---

16. "Negative amortization means that the principal amount of the debt increases over time because interest is not paid at the same rate it accrues, and the unpaid portion is added to the principal." *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 395 (Bankr.W.D.Tenn.1991).

negative amortization have done so in the chapter 11 context, analyzing whether this type of repayment met the "fair and equitable" requirement for confirmation of a cramdown plan under 11 U.S.C. § 1129(b)(2).[17] *See Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1177 (9th Cir.1992) and the cases cited therein.

Only four reported decisions discuss negative amortization in a chapter 12 plan, with the court in each case considering whether repayment of this type of debt meets the chapter 12 confirmation requirement of § 1225(a)(5)(b)(ii) that the creditor be paid the present value of its allowed secured claim. *See In re Gough,* 190 B.R. 455 (Bankr.M.D.Fla.1995); *In re Hoffmann,* 168 B.R. 608 (Bankr.N.D.Ohio 1994); *In re Fowler,* 83 B.R. 39 (Bankr.D.Mont.1987), *appeal decided,* 903 F.2d 694 (9th Cir.1990); *In re Big Hook Land & Cattle Co.,* 81 B.R. 1001 (Bankr.D.Mont.1988). With little discussion, the *Hoffmann* court held, *ipso facto,* that because the repayment proposal resulted in a negative amortization of the creditor's loan, § 1225(a)(5)(B)(ii) was not satisfied. *In re Hoffmann,* 168 B.R. at 613. In the other three cases, the two courts (both *Fowler* and *Big Hook* were written by the same judge) concluded that notwithstanding the negative amortization for the first years of the plan (one year in *Gough,* three and four years in *Fowler* and *Big Hook* respectively), the present value requirement of § 1225(a)(5)(B)(ii) was met because the loan principal and deferred interest would be paid in full over the remaining life of the plan at an appropriate rate of interest. *See In re Gough,* 190 B.R. at 458; *In re Fowler,* 83 B.R. at 43; *In re Big Hook Land & Cattle Co.,* 81 B.R. at 1006. In none of these cases did the courts discuss or otherwise address the suitability of negative amortization in a chapter 12 plan of reorganization.

Because of the substantial similarity between the cramdown provisions of §§ 1129(b)(2)(A)(i) and 1225(a)(5)(B), this court finds the analyses of negative amortization in chapter 11 cases to be relevant and helpful in the context of chapter 12 cases. With one exception, all of the courts considering a negative amortization proposal in a chapter 11 plan have refused to adopt a *per se* rule against such treatment, preferring to consider the issue on a case-by-case basis. *See Great Western Bank,* 953 F.2d at 1177, and the cases cited therein. Few courts, however, have actually approved such proposals.[18] *See* Neil Batson, *Real Estate Problems in the Bankruptcy Court–Selected Issues in Single Asset Real Estate Cases,* 753 PLI/COMM 401, 420 (1996). The Ninth Circuit has noted that this reluctance is not surprising because "plans of that type tend to be fraught with pitfalls that unfairly endanger creditors." *Great Western Bank,* 953 F.2d at 1177.

Many courts have found the following list of factors to be relevant in considering a negative amortization plan:

**17.** Section 1129(b)(2) defines "fair and equitable" in relation to the treatment of claims in a chapter 11 plan. Section 1129(b)(2)(A)(i) provides that a plan is fair and equitable with respect to a class of secured claims if, *inter alia,* each holder of a secured claim retains its lien and receives deferred cash payments with a present value as of the effective date of the plan of not less than its allowed secured claim. *In re 8315 Fourth Ave. Corp.,* 172 B.R. 725, 733 n. 5 (Bankr.E.D.N.Y.1994).

**18.** In the cases where negative amortization plans were approved, there was a substantial equity cushion or other safeguards to protect the secured creditor during the deferral period or the original loan contained a negative amortization feature. *See In re Beare Co.,* 177 B.R. 886 (Bankr.W.D.Tenn.1994) (proposed plan terms similar to terms lender bargained for when loan was originally made); *In re Consolidated Proper-*

*ties Ltd. Partnership,* 170 B.R. 93 (Bankr.D.Md. 1994) (value of creditor's interest not unduly jeopardized); *In re Bouy, Hall and Howard and Assoc.,* 141 B.R. 784 (Bankr.S.D.Ga.1992) (amount and length of deferral reasonable, value of collateral was increasing proportionally with increase in debt, collateral was real property which was expected to appreciate, no undue shift of risk to creditor); *641 Assoc., Ltd. v. Balcor Real Estate Finance, Inc. (In re 641 Assoc., Ltd.),* 140 B.R. 619 (Bankr.E.D.Pa.1992) (short deferral period, 10% equity cushion, collateral was real property expected to appreciate in value, risks borne by creditor no greater than those borne by any other major creditor); *In re Club Associates,* 107 B.R. 385 (Bankr.N.D.Ga.1989), *appeal decided,* 956 F.2d 1065 (11th Cir.1992) (original note provided for negative amortization and collateral was expected to increase in value).

1. Does the plan offer a market rate of interest and present value of the deferred payments?

2. Is the amount and length of the proposed deferral reasonable?

3. Is the ratio of debt to value satisfactory throughout the plan?

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible?

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable?

6. Are the risks unduly shifted to the creditor?

7. Are the risks borne by one secured creditor or class of secured creditors?

8. Does the plan preclude the secured creditor's foreclosure?

9. Did the original loan terms provide for negative amortization? and

10. Are there adequate safeguards to protect the secured creditor against plan failure?

*Id.*

Applying these factors to the present case leads to the overwhelming conclusion that negative amortization should not be permitted. Although the deferral period is relatively small, the risk of loss is shifted entirely to Consumer: Consumer's collateral will be used extensively to generate the debtors' income until the annual crops are harvested and there is no equity cushion to protect from the loss occasioned by such use or to secure the capitalized deferred interest. *See In re Consolidated Properties Ltd. Partnership*, 170 B.R. 93, 99 (Bankr.D.Md.1994) ("Only where it is clear that a negative amortization plan does not unduly shift the risk of loss to the creditor, should the Court [approve the plan]."). As discussed earlier, the nature of Consumer's collateral is inherently risky and unstable and there are no safeguards to guarantee that Consumer will receive the present value of its collateral in the event of a plan default. *See In re Memphis*

*Partners, L.P.*, 99 B.R. 385, 388 (Bankr. M.D.Tenn.1989) ("The problem [with negative amortization] is that in the early years of such financing the creditor is at risk of not receiving the present value should the plan end prematurely."). Because of these factors, this court is unable to conclude that the negative amortization repayment proposal of the debtors meets the present value requirement of § 1225(a)(5)(B)(ii). Consumer's objections to confirmation will be sustained.

## IV.

■ Lastly, the court turns to the overriding issue in this case: whether the debtors will be able to make the payments called for under the plan, the feasibility requirement of 11 U.S.C. § 1225(a)(6).[19] Both the Trustee and Associates contend that the debtors' plan is not feasible, asserting that the debtors have never done the volume of work on which the plan depends. They note that the debtors' annual gross farm income did not exceed $80,000.00 for any of the last several years; that since 1989 the debtors have sustained operating losses for every year but two; that the debtors' farm income in 1996 was only $5,000.00; that the debtors have not harvested a tobacco crop in the last two or three years; that the debt on the farm has increased from $35,000.00 in 1989 to over $120,000.00 presently; that despite the fact the debtors have not serviced their debts for the last year due to their two chapter 12 filings, they have accumulated no savings; that the debtors' lease of additional land on which their plan is dependent is verbal, not written; that the plan is dependent on the labor of debtors' two sons; and that Mr. Howard is 62 years of age.

■ Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment. *In re Foertsch*, 167 B.R. at 566. As with respect to the feasibility confirmation requirement of both chapter 11 and 13 plans, the chapter 12 feasibility standard requires a court to scrutinize a debtor's

---

**19.** 11 U.S.C. § 1225(a)(6) provides:
 (a) Except as provided in subsection (b), the court shall confirm a plan if—
 . . .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

proposed plan payments in light of projected income and expenses in order to determine whether it is likely the debtor will be able to make the payments required by the plan. *Id.* at 565; 8 COLLIER ON BANKRUPTCY ¶ 1225.02[5] (15th ed. rev.1997). It is not necessary for debtors to "guarantee the ultimate success of their plan, but only to provide a reasonable assurance that the plan can be effectuated." *In re Gough*, 190 B.R. at 458 (quoting *In re Butler*, 101 B.R. 566, 567 (Bankr.E.D.Ark.1989)). "Feasibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove, equally difficult to decide." *Matter of Bluridg Farms, Inc.*, 93 B.R. 648, 656 (Bankr.S.D.Iowa 1988) (quoting *In re Kloberdanz*, 83 B.R. 767, 773 (Bankr.D.Colo.1988)). "Projecting future income and expenses can never be an exact science especially in farming where an operation is highly susceptible to vicissitudes in the weather and economy." *In re Foertsch*, 167 B.R. at 566.

 Because the purpose of chapter 12 is to promote the reorganization attempts of family farmers, many courts give debtors the benefit of the doubt on the issue of feasibility provided a reasonable probability of success is established. *See, e.g., In re Gough*, 190 B.R. at 458; *In re Foertsch*, 167 B.R. at 566; *Farmers Home Admin. v. Rape*

*(In re Rape)*, 104 B.R. 741, 748 (W.D.N.C. 1989); *In re Big Hook Land & Cattle Co.*, 81 B.R. at 1006. Feasibility, however, must be based on objective facts rather than wishful thinking. *In re Gough*, 190 B.R. at 458. The Eighth Circuit Court of Appeals has observed that the feasibility standard:

> contemplates the probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make the plan feasible and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

*Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985) (quoting *Matter of Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978)).

Although no cash flow projections comparing the proposed plan payments with the debtors' projected farming operations were submitted at the confirmation hearing, the court has extracted from the plan the amounts which must be paid in order for the debtors to execute their plan. As set forth in *Appendix 1* to this memorandum, the debtors' plan as presently proposed calls for the following payments:

| Year | Monthly Payments | Annual Payments [20] | Yearly Total |
|---|---|---|---|
| 1997 | $ 1,485.61 | $ 32,307.97 | $ 33,793.58 |
| 1998 | $ 3,192.00 | $ 25,719.66 | $ 28,911.66 |
| 1999 | $ 3,743.00 | $ 25,646.27 | $ 29,389.27 |
| 2000 | $ 3,694.00 | $ 25,663.27 | $ 29,357.27 |
| 2001 | $ 3,645.00 | $ 25,729.62 | $ 29,374.62 |
| 2002 | $ 3,596.00 | $ 15,775.07 | $ 19,371.07 |
| 2003 | $ 3,000.00 | $ 15,419.07 | $ 18,419.07 |
| 2004 | $ 3,000.00 | $ 15,062.07 | $ 18,062.07 |
| 2005 | $ 3,000.00 | $ 14,704.07 | $ 17,704.07 |
| 2006 | $ 3,000.00 | $ 16,331.07 | $ 19,331.07 |
| 2007 | $ 3,000.00 | $ 12,847.07 | $ 15,847.07 |
| 2008–2016 | 0.00 | $ 12,847.07 | $ 12,847.07 |

To make these plan payments, the debtors have projected the following operations for

1997 and presumably throughout the plan:

**20.** Although Annual Payments under the debtors' plan will be made in January of each year, they will be paid out of the previous year's earnings.

Accordingly, they are included in the year they will be earned.

## 1997 Farm Income & Expense Projections [21]

Income:

| | |
|---|---|
| Milk | $29,000.00 |
| Tobacco | $87,400.00 |
| Livestock sales | $ 8,250.00 |
| Pumpkins | $ 6,000.00 |
| Custom Hay Bailing | $ 2,000.00 |
| | $132,650.00 |

Expenses:

| | |
|---|---|
| Dairy & Beef Cattle Related Expenses | $21,145.00 |
| Seed, Fertilizer & Lime | $ 6,500.00 |
| Tobacco Related Expenses | $22,760.00 |
| | $ 50,405.00 |

Projected Annual Net Farm Income: $ 82,245.00

---

Clearly, based on a comparison of the projected farm net income with the proposed plan payments, the plan will "cash flow," *i.e.*, mathematically, the plan will work. Technical feasibility alone, however, is insufficient. The plan must also be realistic; the debtors must be able to do what they are proposing. *In re Fenske*, 96 B.R. 244, 248 (Bankr.D.N.D.1988) ("A debtor presenting a Chapter 12 plan bears the burden of proving that the proposal is both realistic and will cash flow.").

The historical financial data of a debtor's farming operations is highly instructive in evaluating "doability." *In re Foertsch*, 167 B.R. at 566. A comparison of the debtors' projected annual net farm income of $82,245.00 with the debtors' earnings from farming operations since 1989 reveal that the debtors are projecting annual net farm income greater than their annual **gross** farm income for any year during the last eight years. The highest gross farm income generated by the debtors during this period was $79,787.00 in 1991, and this sum has dropped almost every year since then.

Net farm income of $82,245.00, however, is not necessary for the cash flow of the plan. Instead, less than half this amount is needed annually to carry out the terms of the plan. As indicated above, plan payments for 1997 total less than $34,000.00, for 1998–2001 plan payments are less than $30,000.00 annually, for 2002–2007 less than $20,000.00 a year, and below $13,000.00 annually thereafter. It is correctly noted by Associates and the Trustee that net profits even in these reduced amounts have not been produced by the debtor within the last several years. An

21. The income figures were derived from *Exhibit B* to the Joint Pretrial Statement filed May 5, 1997, which set forth certain projections that had been submitted to the U.S. Trustee in early December 1996. Because the expense numbers on this report were incomplete, the court utilized the expense projections contained in the Debtors' Amended Statement of Farm Operating Income And Expenses filed December 12, 1996. This statement also had income projections and estimated annual farm income of $124,900.00, consisting of $87,400.00 from tobacco sales and an average of $37,500.00 in milk proceeds. No amounts were listed for livestock sales and other cash crops, although the statement indicated that income may be produced from these sources. The court utilized the income figures from the report to the Trustee rather than the statement of December 12, 1996, since Mr. Howard indicated at the confirmation hearing that he was proceeding in accordance with these projections.

The projections do not include household expenses and non-farm related income consisting of Mrs. Howard's earnings and her monthly pension because these amounts would appear to net each other out and have no effect on plan performance. The debtors' amended schedule of expenses filed December 12, 1996, lists Mrs. Howard's monthly net income at $1,075.00 and monthly household expenses of $994.00 and Mr. Howard testified that Mrs. Howard's income alone was sufficient to cover household expenses. This testimony was confirmed by the debtors' monthly operating reports.

examination of the debtors' tax returns for 1989–1995 indicates that the debtors experienced net operating losses from farm operations for every year during this time period except 1991 and 1993. A closer look at these tax returns, however, reveal that the debtors have generated sufficient cash flow to make the proposed plan payments. The farm operating expenses listed in the tax returns include depreciation which does not affect cash flow, mortgage payments which will be paid through the plan, and various rental payments which are no longer an obligation of the debtors. If depreciation, mortgage payments, and rentals are added back to income as shown in the following table, the net farm income which would have been available for plan payments had the debtor been in chapter 12 during this time changes considerably.

| Year | Gross Farm Income | Net Farm Income | Depreciation, Mortgage and Rentals | Adjusted Cash Flow |
|------|-------------------|-----------------|-------------------------------------|--------------------|
| 1989 | $70,436.00 | ($18,521.53) | $15,442.53 | ($ 3,079.00) |
| 1990 | $72,349.54 | ($ 831.35) | $23,927.35 | $23,096.00 |
| 1991 | $79,787.00 | $ 6,056.00 | $26,220.00 | $32,276.00 |
| 1992 | $76,940.00 | ($ 9,217.00) | $21,729.00 | $12,512.00 |
| 1993 | $54,223.00 | $ 388.00 | $25,671.00 | $26,059.00 |
| 1994 | $27,308.00 | ($ 5,414.00) | $13,392.00 | $ 7,978.00 |
| 1995 | $30,081.00 | ($ 691.00) | $15,535.00 | $14,844.00 |

Rather than operating losses, a positive cash flow is produced for every year but 1989, with available net farming income ranging from a high of $32,276.00 to a low of $7,978.00 excluding 1989. Thus, the debtors have come within $1,500.00 of producing the cash flow necessary to make the first year's plan payments of $33,793.67 and have exceeded the cash flow necessary for the 1998 payments and thereafter. These numbers indicate to the court that the debtors' plan is doable.[22]

Furthermore, the level of farming operations projected under the plan is not substantially different than the debtors' farming operations in previous years. The debtors propose annual dairy production of $29,000.00, annual cattle sales of $8,250.00, and raising twenty acres of tobacco. In 1993, the debtors farmed fifteen acres of tobacco, had milk earnings of $30,161.57, and cattle sales of $11,374.82. The reason that the debtors were not financially successful in 1993 was the loss of the tobacco crop to a wind and hail storm and the insurer's refusal to compensate for the loss. Similar prosperous results from milk and livestock sales were generated in 1989 and 1990.[23] In 1990, the debtors earned $47,494.00 from the sale of milk and $12,130.00 from cattle sales. In 1989, $31,469.16 was generated from milk sales and $21,476.13 from the sale of cattle and hogs. Again, the major difference between these years and the debtors' projections is the size and success of the debtors' tobacco crop. Mr. Howard testified that he has successfully raised twenty acres of tobacco before although he admitted that it had been some time since he had done so. Both he and his sons were confident that if given the opportunity, they can successfully harvest twenty acres of tobacco again. Clearly the success of the plan hinges on the debtors' ability to do so. This chapter 12 proceeding will give the debtors the chance to

**22.** Even if farm income is 25% less than projected, *i.e.*, $99,487.50 ($132,650 × 75%), and expenses are 25% greater, i.e., $63,006.25 ($50,405 × 125%), net farm income of $36,481.25 will be produced, an amount more than sufficient to meet plan obligations.

**23.** Only the years of 1989, 1990, and 1993 are given as examples because only the tax returns for these particular years break down the farm income figures and indicate how much is produced from each type of farming activity.

prove that they can surmount the vagaries of nature and the mishaps of the last few years.

Other concerns were raised regarding the condition and age of the debtors' two tractors, both of which are at least ten years old.[24] Mr Howard testified that both of the tractors are in good condition, that the life expectancy of the tractors was twenty years or better, and that he had no reason to believe that the tractors might not be operable for the next several years. This testimony was not disputed. In addition, the plan payments drop significantly in five years freeing up funds for the replacement of any effete equipment.

Of particular concern to this court is the age of Mr. Howard. At 62 years of age, it is questionable as to how much longer he will be able to continue the sometime sixteen hour days which he admits will be necessary to meet the plan projections. While the majority of claims will be paid under the plan within the next five years, Consumer has a ten-year payout and Associates is stretched over twenty years. Although Mr. Howard's age was touched upon at the confirmation hearing both by the objecting creditors who questioned his ability to work the necessary hours and by Mr. Howard who testified that he was in good health and anticipated being able to meet the labor intensive demands of farming, little attention was given as to how the debtors could maintain the required pace for twenty years by which time Mrs. Howard will be 77 years of age and Mr. Howard, 82. To this court, it is simply not credible that farmers the ages of the debtors can continue for twenty years the level of farming activity which the debtors concede is required for this plan to succeed. *Cf. In re Hoffmann,* 168 B.R. at 610 (one of factors court considered in denying confirmation of a ten-year plan was debtor's age of 60).

Although presumably by the end of the plan the debtors will be relying solely on the efforts of their two sons who expect to inherit the farm, Associates' contract is with the debtors, not their sons. In effect the debtors will be transferring the benefits of this chapter 12 plan to their sons without Associates' approval. The treatise COLLIERS ON BANKRUPTCY has noted that one way to overcome this potential inequity is to permit the plan to provide for a long-term amortization but to impose a balloon payment at the end of the specified period. 8 COLLIERS ON BANKRUPTCY ¶ 1225.03[4][b][i] (15th ed. rev. 1997). A balloon payment is feasible in the present case due to the substantial equity in the farm. With the ages of the debtors and the other circumstances of this case, fifteen years would be the outside permissible plan length. Such a period of time would enable the sons to establish a sufficient credit history to obtain a loan to pay off the balloon payment at the end of the plan if that is their intention.[25] Furthermore, although this is not determinative, a fifteen-year plan is in line with the payout of the debtors' original note with Associates which provided for a fifteen-year term. *See* 8 COLLIERS ON BANKRUPTCY ¶ 1225.03[4][b][i] (15th ed. rev. 1997) (a relevant consideration in determination of appropriate repayment period is length of original loan).

## V.

The foregoing is the court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a), as incorporated by Fed. R. Bankr.P. 7052. With the changes discussed in this opinion being made, the debtors can propose a confirmable plan. An order will be entered in accordance with this memorandum opinion sustaining Consumer's objections to confirmation in their entirety, overruling all objections of Associates and the Trustee except with respect to feasibility over the long-term of the plan, and overruling the objection of G.T. Bacon for failure to prosecute. The

---

**24.** At the confirmation hearing, Mr. Howard testified that the 3600 Ford tractor was a 1979 model and that the 4600 Ford tractor was a 1982 or 1984 model. However at the February 18 hearing before this court, Mr. Howard testified that one tractor was an '87 and the other an '86. On the other hand, Consumer's UCC–1 lists the 3600 Ford tractor as a 1977 model.

**25.** Mr. Howard testified that the debtors' intention in the first chapter 12 case was to sell the farm to their sons. However, the sons did not have a credit history and thus were unable to borrow the funds needed to effectuate the purchase.

debtors will be provided fourteen days to file an amended plan. Creditors and parties in interest will have seven days thereafter in which to object. If objections are filed, the court may rule on the objections without a hearing or may set a hearing if one is requested. If no objections are filed, the amended plan may be confirmed without further notice or hearing.

## ORDER

In accordance with the memorandum opinion filed herewith, the objections to confirmation filed by G.T. Bacon on March 21, 1997, are overruled for failure to appear in prosecution thereof; the objections to confirmation filed by Consumer Credit Union on April 22, 1997, are sustained; and the objections to confirmation filed on April 21, 1997, by Associates Financial Services Company, Inc. (incorporating its previous objections filed on March 18, 1997), together with the objections to confirmation filed by the chapter 12 trustee on March 20, 1997, to the extent the trustee pursued the objections at the confirmation hearing on May 13, 1997, are all overruled except with respect to Associates and the chapter 12 trustee's objection as to feasibility over the long-term of the plan.

Because the court has concluded that the debtors have the ability to propose a confirmable plan if certain modifications are made in accordance with the court's memorandum opinion, the debtors will be provided fourteen days to file an amended plan. Debtors' counsel shall serve any amended plan upon the chapter 12 trustee, Consumer Credit Union, Associates, and any other creditors and parties in interest adversely affected by the changes in the amended plan. Such creditors and parties in interest will have seven days after the filing of any amended plan in which to file and serve written objections thereto. If objections are filed, the court may rule on the objections without a hearing or may set a hearing if one is requested. If no objections are filed, the amended plan may be confirmed without further notice or hearing.

SO ORDERED.

## APPENDIX 1

### Plan Payment Summary

| ANNUAL PAYMENTS | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008-2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class 1 (ad. exp.) | $ 8,000.00[a] | | | | | | | | | | | |
| Class 2 (taxes) | $ 745.23 | $ 710.03 | $ 676.44 | $ 642.05 | $ 607.55 | | | | | | | |
| Class 3 (Assoc.) | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 | $12,847.07 |
| Class 4 (Consumer) | $ 4,502.00 | $ 4,956.00 | $ 3,999.00 | $ 3,642.00 | $ 3,285.00 | $ 2,928.00 | $ 2,572.00 | $ 2,215.00 | $ 1,857.00 | $ 3,484.00 | | |
| Class 5 (Superior Claim 2) | $ 1,517.00 | $ 1,423.00 | $ 1,329.00 | $ 1,235.00 | $ 1,140.00 | | | | | | | |
| Class 6 (United S.E. Fed. Credit Union) | $ 746.67 | $ 746.76 | $ 746.76 | $ 311.15 | | | | | | | | |
| Class 7 (Unsec.) | $ 3,950.00 | $ 5,036.00 | $ 6,049.00 | $ 6,986.00 | $ 7,850.00 | | | | | | | |
| Total Annual Payments | $32,307.97 | $25,719.66 | $25,646.27 | $25,663.27 | $25,729.62 | $15,775.07 | $15,419.07 | $15,062.07 | $14,704.07 | $16,331.07 | $12,847.07 | $12,847.07 |
| **MONTHLY PAYMENTS[b]** | | | | | | | | | | | | |
| Class 4 (Consumer) | $ 1,050.00 | $ 2,400.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | |
| Class 5 (Superior Claim 1) | | $ 792.00 | $ 743.00 | $ 694.00 | $ 645.00 | $ 596.00 | | | | | | |
| Class 6 (United S.E. Fed. Credit Union) | $ 435.61 | | | | | | | | | | | |
| Total Monthly Payments | $ 1,485.61 | $ 3,192.00 | $ 3,743.00 | $ 3,694.00 | $ 3,645.00 | $ 3,596.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | |
| YEARLY TOTALS | $33,793.58 | $28,911.66 | $29,389.27 | $29,357.27 | $29,374.62 | $19,371.07 | $18,419.07 | $18,062.07 | $17,704.07 | $19,331.07 | $15,847.07 | $12,847.07 |

[a] The debtors obtained authorization to borrow up to $8,000.00 from Johnson City Chemical Company for the purchase of planting supplies, with the sum borrowed to be paid as an administrative expense. The amounts owed for professional fees of debtors' and Trustee's counsel are unknown.

[b] Monthly payment amounts do not include Trustee fees.