**In re James Graham LOCKARD and Emily Greer Lockard, Debtors.**

**Bankruptcy No. 98–31028–12.**

United States Bankruptcy Court, W.D. Missouri.

June 4, 1999.

J. Kevin Checkett, Carthage, MO, for debtors.

### MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

James Lockard and Emily Lockard, the owners of a 75–acre turkey farm in the

Missouri Ozarks, have filed a proposed reorganization plan in these Chapter 12 proceedings. The Chapter 12 Trustee and NationsBank, the Debtors' primary secured creditor, have objected to the plan. The Trustee has also filed a Motion to Dismiss, principally on the grounds that the plan is not feasible. For the reasons discussed below, the Court will deny confirmation of the Debtors' First Amended Plan, deny the Trustee's Motion to Dismiss, deny NationsBank's and the Trustee's Objections to Confirmation except to sustain NationsBank's objection to the proposed interest rate and term of repayment of its note, and will allow the Debtors additional time in which to propose another amended plan.

## PROCEDURAL HISTORY

The Debtors filed a voluntary petition under Chapter 12 of the Bankruptcy Code ("Code") on November 23, 1998, and an Order for Relief was entered. On February 19, 1999, the Debtors filed their original Plan of Reorganization ("the original Plan"). Fred C. Moon, the Chapter 12 Trustee ("Trustee"), filed objections to confirmation of the original Plan, along with a Motion to Dismiss, which were heard by the Court on March 18, 1999. (Objections that had been filed by other creditors were withdrawn after agreements were reached with the Debtors.) At the conclusion of that hearing, the Court announced its intention to confirm the original Plan, subject to certain clarifications that were to be included in the Order of Confirmation that was to be prepared by counsel for the Debtor. However, instead of submitting a proposed Order as directed, counsel for the Debtor subsequently notified the Court by letter that a settlement with NationsBank ("Bank") had "fallen apart," and that counsel believed it would be necessary for the Debtors to file an amended Chapter 12 Plan. The Court

granted the Debtors' informal request to file an amended Plan and scheduled a further hearing on confirmation on April 22, 1999.

On April 2, 1999, the Debtors filed their First Amended Chapter 12 Plan ("Amended Plan") and circulated it to all creditors. The Bank filed an Objection to the Amended Plan, asserting that it was not proposed in good faith, that it was not feasible, and that it proposed an unreasonable, below-market interest rate and an unreasonable term of repayment with respect to the secured debt held by the Bank. The Court conducted a further hearing on confirmation on April 22, 1999, and at that time the Debtors and the Bank presented evidence. Because the Bank's primary witness was unavailable for the hearing, and because the Court was unwilling to continue the hearing on confirmation any further, the Court allowed the Bank to submit its witness' testimony by affidavit, and allowed the Debtors time in which to submit whatever responses they desired to the affidavit. Their Response was filed on May 17, 1999. The parties have submitted written arguments, and the Court is now ready to rule.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTUAL BACKGROUND

The Lockards bought their 75–acre farm property in October 1994 at a cost of $56,-250.00. They put in roads and a well and made other improvements costing an additional $20,000.00. The Debtors then borrowed $355,000.00 from the Bank[1] to put in a "heavy tom turkey unit," a system of turkey houses and equipment for the production of turkeys for the retail food market. Lockard testified that the turkey

---

1. The loan actually was obtained from Boatmen's Bank of Southern Missouri. The Boatmen's chain of banks was subsequently purchased by NationsBank and therefore the note is now held by NationsBank. References in this opinion to "the Bank" are intended to include Boatmen's Bank.

farm is now worth over $440,000.00. This valuation testimony was not contested by the Bank or the Trustee.

The original note with the Bank, dated November 9, 1995, provided for an initial interest rate of 10% per annum, and thereafter the interest rate was to be the prime rate as published in the Wall Street Journal plus 1½%, adjustable monthly. The Debtors were required to pay only the interest on the note for the first year, with semi-annual payments of principal and interest in the amount of $29,685.94 each commencing one year after the date of the note. The note was payable in 10 years. However, after the Debtors began having troubles making their payments to the Bank, the term of the loan was extended from 10 years to 15 years, and the current maturity date of the loan is June 11, 2012, approximately 13 years from now. The note is secured by a blanket mortgage on the Debtors' real estate, equipment and machinery, accounts receivable, contract rights and inventory.

Mr. Lockard is 69 years old and is retired from the construction industry. He worked around the world for various companies in many types of construction projects, including building poultry science buildings. He retired from the construction industry and decided to go into the turkey production business. With the money borrowed from the Bank, he constructed three turkey production houses in 1995. Initially, the Lockards lived on the farm and ran the business, but the business did not prosper, primarily because mortality in the turkey flocks was higher than average. In 1998 the Lockards turned over management of the farm to Clifford Shepard and then moved to Georgia, where Mr. Lockard obtained a job as a consultant to the U.S. government on military construction projects, earning an annual salary of $50,000.00. Lockard testified that he has an oral agreement with Shepard that Shepard can purchase the farm from the Lockards in five years, if Shepard wants to do so and can obtain the

necessary financing. In the meantime, Shepard, his wife, and his wife's three minor sons live rent-free in a mobile home (owned by the Debtors) on the property and manage and maintain the turkey farm on a day-to-day basis.

From the beginning, the Debtors had trouble making their payments to the Bank. They defaulted on the first semi-annual amortization payment on the note in November 1996. From January to May 1997 the Bank placed the loan on interest-only payments to enable the Lockards to pay other debts and catch up with payments to suppliers. Within a year, the Lockards were again delinquent in payments to suppliers. In October and November 1998 the Lockards asked the Bank to forebear on their mortgage payments because of, among other things, sickness and heat stress in the turkey flocks and a decision by Hudson/Willowbrook Farms (the company with which the Debtors had contracted to grow the turkeys) earlier in 1998 to cut back on the number of flocks to be produced per year (from 6½ flocks per year to 6 flocks per year). In late October 1998, the Bank agreed to forebear collection for 90 days to allow the Debtors time to sell the farm, which they apparently were unable to do. They filed their Chapter 12 Petition on November 23, 1998.

The Debtors have based their reorganization plan on projected gross income of $105,915.00 per year, consisting of $103,415.00 from the production of turkeys and $2,500.00 from the sale of hay. This projection is based on producing 6½ flocks of turkeys per year, which is Hudson's projection, instead of the 7 flocks which Lockard believes are possible. The Debtors have already fallen behind their projected income for 1999, because the flock sold in March brought a gross of only $11,500.00 rather than the $15,910.00 projected. Lockard attributed this shortfall to a high mortality in the turkeys caused by an outbreak of cholera. The Debtors project total operating expenses of $48,420.00, leaving them with net operating income of

$57,495.00. From that net income, the Debtors propose to pay NationsBank six payments of $6,651.00 each year, or a total of $39,306.00, to be applied to the mortgage debt. After all other payments are made, including $9,171.00 a year to their unsecured creditors, the Debtors project that they will have a net profit of $3,919.00 a year.[2]

The original Plan filed by the Debtors proposed that the secured debt to NationsBank would be paid according to its contractual terms, that is, at the variable interest rate specified in the note, with payments to commence 60 days after the effective date of the Plan. Such a Plan would have resulted in full payment of the mortgage debt to the Bank in approximately 13 years. The Court was prepared to confirm this Plan, particularly because it was not opposed by the Bank and there is equity cushion of approximately $100,-000.00 on the Bank debt, although the Court had some misgivings about the Debtors' projected income and expenses. In contrast, the Amended Plan provides that the Bank's note, which has a balance owing of approximately $339,880.00, would be paid over 20 years with interest of 7% per annum. The Debtors would make six equal payments each year by assignment from their turkey sales checks. It is this Plan that the Bank opposes. The Trustee did not renew his objections to the Amended Plan and did not appear at the hearing on April 22, but the Court is proceeding on the assumption that the Trustee continues to oppose confirmation of the Plan.

## DISCUSSION

Section 1225 of the Code (11 U.S.C. § 1225) sets out the requirements for confirming a Chapter 12 plan.[3] There are five

---

**2.** These projections are taken from an exhibit to the Debtors' Amended Plan. They are difficult to reconcile with statements made in the body of the Plan. In Article V of the Plan, the Debtors state first that there will be no disposable income annually, but later in the same paragraph state that they will have disposable income of $12,915.00, which they say will be paid to the Chapter 12 Trustee for payments to be made to unsecured creditors (who are to be paid in full) and the Trustee for his fees. After those payments are made, the bottom-line shows a net profit of $3,919.00 a year, according to an exhibit to the Amended Plan.

**3.** (a) Except as provided in subsection (b), the court shall confirm a plan if—
(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
(3) the plan has been proposed in good faith and not by any means forbidden by law;
(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.
(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

general standards and one specific standard applicable only to secured claims that must be satisfied before a plan can be confirmed. No issue has been raised as to the Debtors' compliance with § 1225(a)(1), (2), (4) and (b), and the Court finds compliance with the requirements of those subsections. Accordingly, the Court will confine its discussion to the issues raised by the Bank and the Trustee, namely (1) whether the Amended Plan is filed in good faith, § 1225(a)(3); (2) the feasibility of the Amended Plan, § 1225(a)(6); and (3) whether the treatment of the Bank's secured claim complies with § 1225(a)(5)(B)(ii).

### 1. Good faith

The Bank's contention that the Debtors' Amended Plan is not filed in good faith is primarily based on the following facts: the Lockards no longer live on the farm property but have moved to the State of Georgia; Mr. Lockard has taken off-farm employment; the Lockards have turned the farming operation over to a farm manager; and the Lockards have entered into an oral "lease/purchase" agreement with the farm manager for eventual sale of the turkey farm. The Bank argues that the Debtors have "abandoned farming" and therefore confirmation of the Amended Plan will not advance the purposes of Chapter 12, which is to help family farmers continue farming.

■ Section 1225(a)(3) requires that the Chapter 12 plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1225(a)(3). It has been said that § 1225(a)(3) requires the court to review the plan for "fundamental fairness in dealing with one's creditors." *In re Foster*, 84 B.R. 707, 710 (Bankr.D.Mont.1988). "In essence, the good faith requirement is

a catch-all provision that allows the court to take an overall look at the use which the debtor has made of the chapter 12 filing. If the court determines that the debtor filed the case or filed the plan for a purpose other than a good faith attempt to reorganize the debtor's farming business, the court is empowered by § 1225(a)(3) to deny confirmation." 8 COLLIER ON BANKRUPTCY ¶ 1225.02[3], p. 1225–7 (15th ed. rev.1999).

■ Clearly, Chapter 12 was intended to enable family farmers to retain their farms while reorganizing their financial affairs. "Chapter 12 of the Bankruptcy Code was specifically designed to assist farm families needing financial rehabilitation ... Chapter 12 was created to give farm families facing bankruptcy a fighting chance to reorganize their debts and to keep their land." *United States Department of Agriculture v. Fisher (In re Fisher)*, 930 F.2d 1361, 1362 (8th Cir.1991) (internal quotation marks omitted). The Bank points to three cases in support of its argument that the Debtors have not filed their Amended Plan in good faith: *In re Tart*, 73 B.R. 78 (Bankr.E.D.N.C.1987); *In re Buckingham*, 197 B.R. 97 (Bankr. D.Mont.1996); and *In re Indreland*, 77 B.R. 268 (Bankr.D.Mont.1987). In *In re Tart*, the court said: "The legislative history of chapter 12 indicates that its primary purpose is to help family farmers *continue* farming." *In re Tart*, 73 B.R. at 81 (emphasis in original). In *In re Buckingham*, the Montana bankruptcy court, relying on *In re Indreland*, in stated that "to reorganize under Chapter 12 of the Code, a petitioner must engage in at least some farming operations over the entire duration of the plan, even if on a cyclical or

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
(A) for the maintenance or support of the debtor or a dependent of the debtor; or

(B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.
(c) After confirmation of a plan, the court may order any entity from whom the debtor receives income to pay all or any part of such income to the trustee.

reduced scale basis." *In re Buckingham,* 197 B.R. at 104.

■ This Court's research has not disclosed any case holding that a Chapter 12 debtor must *continue* farming—or even *promise* to continue farming—throughout the life of the plan in order to remain in a Chapter 12 bankruptcy proceeding, and the Bankruptcy Code does not contain any such requirement. The Code and the cases cited by the Bank speak to a debtor's initial eligibility to file for Chapter 12 protection, but there is nothing in the Code that would require the debtor to *remain* in farming in order to obtain confirmation of a plan or to remain in farming once a plan is confirmed. The Code defines a "family farmer" as an individual or individual and spouse "engaged in a farming operation" whose aggregate debts and income fall within certain parameters, 11 U.S.C. § 101(18), and defines "farming operation" as including, among other things, "production or raising of ... poultry," 11 U.S.C. § 101(21), which is the Debtors' business. If a debtor is not a "family farmer" or is not engaged in a "farming operation," he or she cannot file for relief under Chapter 12 in the first instance. But, once qualified to file under Chapter 12, there is nothing to prevent the debtor from obtaining off-farm employment to help finance the Chapter 12 plan, from reducing the farm operations, selling part of the farmland, reducing the size or types of livestock herds, etc. The Court agrees with the bank that it would not serve the purposes of Chapter 12 and would probably be inappropriate to confirm a plan if the debtor has completely ceased the farming operation, but that is not the case here.[4]

The Bank also argues that, by hiring a resident farm manager and moving to Georgia, the Debtors have "abandoned farming" and therefore their Amended Plan is not filed in good faith. This argument simply does not hold water. Would the Bank be making this same argument if the Debtors had employed a resident farm manager *prior to* filing bankruptcy, and if Mr. Lockard had obtained a $50,000.00-a-year job in Joplin, Missouri, 25 miles away, instead of in Georgia, several hundred miles away? Unlikely.

■ The Court does not accept the argument that a Chapter 12 debtor must continue farming for the life of the plan in order to obtain confirmation of a proposed reorganization plan. Nor does the Court accept the Bank's argument that the Debtors in this case have abandoned farming and are therefore not entitled to have a plan confirmed. There are several facts that support this conclusion. For one, all of the payments proposed in the Amended Plan for payments of the farming debt are to be made from farm income, not from the off-farm income, and the Lockards do not anticipate using any of the farm income for their household living expenses. Second, the Lockards, and no one else, will continue to be responsible for the overall farming operations and will be responsible for all debt payments, even though they may not be residing on the premises and may not be running the turkey farm on a day-to-day basis. Third, the Lockards have hired a resident farm manager to see to the day-to-day operations, so it is not necessary that the Lockards be there on a daily basis. The Lockards should not be penalized for employing a full time manager. Finally, although the Debtors have indicated an intention to sell the farm to the present manager in five years, if the manager wants to purchase it and is able

---

4. The Court does not intend to suggest that a debtor who is initially eligible to file for Chapter 12 relief is forever eligible or qualified to have a Chapter 12 plan confirmed. There could well be circumstances, such as a sale of the complete farming operation after the Chapter 12 is filed but before a plan is scheduled for confirmation, under which a court would justifiably deny confirmation of a plan proposed by an otherwise eligible Chapter 12 debtor. That is not the situation here. If the Bank believed the Debtors were no longer eligible for Chapter 12 protection, it seems that a Motion to Dismiss rather than Objections to Confirmation would be the proper way to raise that issue.

financially to do so, they have produced no written agreement to that effect (though challenged by the Trustee to do so) and there is certainly no assurance that they will be able to sell the farm to the manager or anyone else within five years. The expressed intent to sell a farming operation during the life of a confirmed plan would certainly not be novel; in fact, many plans are based on a proposed eventual sale of part or all of the farm. And it certainly would not be grounds to deny confirmation of an otherwise feasible plan.

In summary, the Court believes that the Debtors filed their Chapter 12 petition and Amended Plan in a sincere attempt to reorganize their farm finances, and not for any improper purpose. The Plan treats all creditors fairly (with the exception of NationsBank, as discussed below). Accordingly, the Court finds that the Bank's objections to the Amended Plan, on grounds that it was not filed in good faith, are without merit.

## 2. Feasibility

The Court now turns to its consideration of the feasibility of the proposed plan filed by the Debtors. Because of our determination that the Amended Plan cannot be confirmed because of the treatment accorded the Bank, our discussion concerning feasibility will be limited, and is included at this point to indicate that the Court does find the proposed plan feasible and capable of successful performance.

 Section 1225(a)(6) requires the Court to find that a reorganizing debtor "will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). "The feasibility test requires the court to analyze the debtor's proposed plan payments in light of the debtor's projected income and expenses and to determine that the debtor is likely to be able to make all payments required by the plan." 8 COLLIER ON BANKRUPTCY ¶ 1225.02[5], p. 1225–10 (15th ed. rev.1999). Feasibility is fundamentally a factual question, since it necessarily depends upon a determination of the reasonable probability of payment. *In re Howard,* 212 B.R. 864, 878 (Bankr.E.D.Tenn.1997).

 Because the purpose of Chapter 12 is to promote the reorganization attempts of family farmers, courts generally give debtors the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established. *In re Gough,* 190 B.R. 455, 458 (Bankr. M.D.Fla.1995); *In re Howard,* 212 B.R. at 879. However, feasibility must be based on objective facts, not mere wishful thinking or pipe dreams. *In re Gough,* 190 B.R. at 458. As the Eighth Circuit has said:

> Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

*Clarkson v. Cooke Sales and Service Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985) (quoting *In re Bergman,* 585 F.2d 1171, 1179 (2nd Cir.1978)).

The Bank, in its post-hearing memorandum, has done a thorough job analyzing the weaknesses of the Amended Plan, and has concluded that its analysis "leads to the inescapable conclusion that the Plan is not feasible." The Court disagrees.

The Bank argues that the Debtors lack adequate operating capital to perform the Amended Plan, that their income projections are overstated, that the Debtors have no cash reserves, that the Debtors will not have sufficient profits from the farming operation with which to make capital improvements or repairs, that they lack capable farm management, and that the Debtors lack the commitment necessary to make the plan work, among other things. Finally, the Bank points out that there are numerous factors beyond the Debtors' control that may adversely affect the turkey farming operation, such as weather, disease, and the fact that the current contract

supplier of turkeys could arbitrarily decide to reduce the number of flocks of turkeys provided to the Debtors each year, thereby reducing the Debtors' gross income.

The Debtors have projected gross income of $103,415.00 a year from the turkey farming operation, based on 6½ flocks per year. This projection is consistent with the Debtors' actual income in two preceding years. In 1997, the Debtors had gross income from the turkey farming operation of $98,084.00, and in 1996 the gross income was $98,084.00. Lockard also testified that he should be able to produce 7 flocks of turkeys in some years, thereby increasing gross income, and he further testified that Hudson/Willowbrook Farms had recently increased its payments by .012 cents per pound, which should increase the Debtors' income per flock by $2,800.00. Such an increase would translate to approximately $20,000.00 a year (6½ flocks times $2,800.00). However, the Amended Plan is not based on this increased payment, which is just being implemented; as the Court understands it, the Amended Plan is based on the previous compensation rate per pound.

The Bank next argues that the Debtors' farming operations have never made a profit, and offered an exhibit showing that the Debtors lost $12,596.00 in 1997 and $7,545.00 in 1996. However, the Bank conveniently overlooks the fact that the "losses" for those years included an entry for depreciation of $45,327.00 in 1997 and $48,513.00 in 1996. At the same time, the Debtors made payments to their secured creditors of $34,092.00 in 1997 and $30,648.00 in 1996. When the non-cash entries for depreciation are removed, the exhibit indicates that the Debtors would have made a profit of roughly $38,000.00 a year in 1996 and 1997. In comparison, the Amended Plan projects net operating income (gross income minus operating expenses) of $57,495.00 a year, out of which the Debtors would make their Plan payments to secured and unsecured creditors in the total amount of $53,576.00. The

Debtors should also have available to them to assist in making the plan payments, if needed, at least some portion of the $50,000.00 a year which Mr. Lockard earns in his consulting job.

It is true, as the Bank points out, that there are inconsistencies in the Debtors' projected operating expenses. For example, the projected utilities expense is 50% higher than actual utilities expenses have been in prior years, and projections for property taxes and insurance are substantially higher than they have been in prior years. On the other hand, projected costs for repairs, supplies and equipment rental are significantly lower than in past years. Lockard contends that his repair, supplies and equipment rental costs will be lower because the resident manager is capable of making most ordinary repairs, whereas Lockard often had to hire someone to do that work. As for the projections that are higher than actual expenses in prior years, presumably those projections are based on more recent experience, and in any event the Court would observe that it is better to overestimate expenses than to underestimate them. To the extent the expenses are overestimated, additional funds would become available for performance of the plan.

As for the Bank's argument concerning the factors that are beyond the Debtors' control, such as weather and disease, the factors present in this case are no different than those in every other Chapter 12 case. Farming—whether it involves raising cattle or turkeys or producing corn or soybeans—is an uncertain business at best. Chapter 12 debtors, like all farmers, are largely at the mercy of the weather, plant and animal diseases, market prices, and various other factors that are far beyond their power to control. If Chapter 12 plans cannot be confirmed because the future is uncertain, then no Chapter 12 plan (or Chapter 11 or Chapter 13 plan, for that matter) would ever be confirmed.

In this case, the Court believes that the Debtors have made realistic pro-

jections of income and expenses, based on their recent history, and that the Amended Plan is both mathematically feasible and realistic. "Projecting future income and expenses can never be an exact science especially in farming where an operation is highly susceptible to vicissitudes in the weather and economy ... [A] debtor's plan need not guarantee success." *In re Foertsch*, 167 B.R. 555, 566 (Bankr.D.N.D. 1994). Of course, there is no guarantee that it will work, but we believe the Debtors have met their burden of proving that the Amended Plan is realistic and will cash flow. *In re Fenske*, 96 B.R. 244, 248 (Bankr.D.N.D.1988).

### 3. Treatment of the Bank's Claim

█ If the holder of an allowed secured claim does not accept the proposed plan, and if the debtor does not surrender to the creditor the property securing the claim, then the plan must meet the requirements of 11 U.S.C. § 1225(a)(5)(B). There are two components to that subsection. First, the plan must provide that the holder of the claim will retain its lien on the property securing the lien. 11 U.S.C. § 1225(a)(5)(B)(i). That is not an issue in this case, inasmuch as the Debtors' Amended Plan provides that the Bank will retain its lien on the Debtors' property until the Bank is paid in full. Second, the plan must provide that the value, as of the effective date of the plan, of property to be distributed under the plan on account of the claim is not less than the allowed amount of such claim. 11 U.S.C. § 1225(a)(5)(B)(ii). In other words, the creditor must be paid the present value of its allowed, secured claim, or the Amended Plan cannot be confirmed over the creditor's objection. In this case, the Bank has objected to repayment of its claim over 20 years with interest at the rate of 7% per annum.

█ As an initial matter, it should be noted that there is no dispute in this case that the Bank is oversecured. The uncontested value of the Debtors' turkey farm (both real and personal property) is approximately $440,000.00, whereas the present amount owed on the debt to the Bank is slightly less than $340,000.00 (not including post-filing interest, fees and costs). Section 506(b) of the Code provides that the amount of a secured claim includes interest on the claim plus "any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). The Bank is entitled to its contract rate of interest through the date of confirmation, *Rake v. Wade*, 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993), and thereafter it will be paid the present value of its oversecured claim pursuant to the confirmed plan. *In re Wilmsmeyer*, 171 B.R. 61, 63 (Bankr.E.D.Mo.1994).

█ In the Eighth Circuit, it is clear that the appropriate interest rate to be paid on a secured creditor's claim in Chapter 12 is the prevailing market rate, which must be determined on a case-by-case basis. *United States v. Doud (In re Doud)*, 869 F.2d 1144, 1146 (8th Cir.1989); *In re Fisher*, 930 F.2d 1361 (8th Cir.1991). In *Doud*, the Court of Appeals noted that an appropriate interest rate should consist of (1) a "risk-free" rate plus (2) additional interest to compensate a creditor for risks posed by the plan. *Id*. The Court quoted with approval its language from the Chapter 11 case of *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985), to the following effect:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

*Doud*, 869 F.2d at 1146.

█ In *Doud*, the Court affirmed the District Court's finding that an appropri-

ate interest rate for a secured claim in Chapter 12 was the yield on United States treasury bonds for the comparable repayment period (this being the "riskless" rate) plus an additional 2% to account for the risks inherent in the loan as affected by the debtors' plan. Although the *Doud* formula has been criticized,[5] and although there is no reason to believe that the Eighth Circuit might very well give its stamp of approval to some other method of determining a market rate of interest, the Court believes that the formula established in *Doud* is well reasoned and appropriate and should be applied in the present case. Applying the *Doud* formula should, in most cases, result in a fair rate of return for the secured creditor, although it probably will not, as a general rule, give the secured creditor the full interest rate for which it had originally bargained. Also, applying the *Doud* formula should provide a degree of uniformity and predictability on which both creditors and debtors can rely in the future as they negotiate the terms of reorganization plans.

■ The Bank argues, and the Court agrees, that due consideration should be given to the original terms of the note in determining appropriate repayment terms for the loan in the Chapter 12 Plan. *In re Koch,* 131 B.R. 128, 131 (Bankr.N.D.Iowa 1991). In the present case, the Debtors' original loan was a 10-year loan, with an initial interest rate of 10% for the first year (when no principal payments were to be made) and a variable interest rate of 1.5% over the prime rate thereafter. Later, however, after the Debtors encountered problems making their loan payments, the Bank agreed to extend the term of the note to 15 years, and there now are approximately 13 years left to maturity.

In his affidavit, the Bank's officer states that the current market rate of interest on agricultural loans being made by NationsBank is a variable rate, currently the prime rate plus 2% or 3%, adjustable annually, and that it is the Bank's practice in bankruptcy or workout situations to not extend the term of repayment beyond three years, even if the loan is secured by real estate. The current prime rate, according to the Bank, is 7.75%. The 15-year Treasury bond rate is currently 13.25% per annum, but the current yield on such bonds is 5.50%, based on evidence submitted by the Debtors. The banker states that it is not the current practice of NationsBank to make agricultural loans at the prime rate or 15-year Treasury bond rate, "especially in bankruptcy reorganization cases."

■ The Debtors have proposed to repay the Bank's note, with its current balance of over $339,000.00, over 20 years with a 7% interest rate. The Court cannot approve this proposal over the Bank's objections for several reasons. First, the 7% interest rate proposed by the Debtors would be less than the 7.5% interest rate that is arrived at by applying the formula approved in *Doud.* Second, Mr. Lockard is 69 years old, and it would not be appropriate to establish a 20-year repayment term for a person of that age. While Mr. Lockard appeared to be in good health in his two appearances before the Court, it is not reasonable to expect that he would remain actively employed and actively engaged in the turkey farm business until he is 89 years old. Third, Mr. Lockard clearly indicated that he is unlikely to continue with the turkey farm operation for the next 20 years. In fact, he testified that he has made an oral agreement with his farm manager, Mr. Shepard, to sell the farm to Mr. Shepard and his wife at the end of five years, if the Shepards want and are able to

---

5. *See e.g., General Motors Acceptance Corporation v. Jones,* 999 F.2d 63 (3rd Cir.1993) (declining to follow *Doud* ); *Hardzog v. Federal Land Bank of Wichita (In re Hardzog* ), 901 F.2d 858, 860 (10th Cir.1990) (opining that

*Doud* does not accurately reflect the market and "may unduly penalize the lender or borrower"); *Warehouse Home Furnishings Distributors, Inc. v. Richards (In re Richards* ), 106 B.R. 762, 763–64 (Bankr.M.D.Ga.1989).

buy it at that time. Finally, extending the note to a 20–year repayment period now would result in the Debtors' having a note of approximately 24 years' total duration, which is well beyond any period the Bank bargained for and beyond the ordinary amortization period for agricultural real estate loans. In short, it would be inequitable under the circumstances to compel the Bank to accept an additional 20–year repayment period, particularly at an interest rate of 7%. *Matter of Rose*, 135 B.R. 603, 606 (Bankr.N.D.Ind.1991).

However, the Court believes that a repayment period of between 10 and 15 years would be reasonable. The Bank at one time agreed to extend the note to 15 years, even though (actually, because) the Debtors were experiencing cash flow problems and were unable to make the loan payments on a timely basis. The note still has 13 years to run. While a repayment term of something less than 13 years would be desirable, particularly when the Bank is receiving interest at a lower rate than would be the case in a nonbankruptcy setting, it is doubtful that the Debtors could pay the loan payments that would be required to amortize the debt in much less than 15 years. Alternatively, the Court would consider reasonable a plan that would provide for a 20–year amortization with a 10–year (or shorter) balloon payment. In view of Mr. Lockard's stated intention to try to sell the farm to his farm manager at the end of 5 years, perhaps a 5–year balloon would be appropriate. *See In re Howard*, 212 B.R. 864, 882 (Bankr. E.D.Tenn.1997); 8 COLLIER ON BANKRUPTCY ¶ 1225.03[4][b][i] (15th ed. rev.1999).

Finally, the Court believes that an interest rate of 7.50% would be an appropriate rate of interest on the Bank's note in this case. That rate would provide the Bank with a return of 2% over the "riskless" rate of 5.50% that it could effectively earn on a 15–year Treasury bond. A 2% upward adjustment should be sufficient in this case to compensate the Bank for the risk factors involved. Because it appears

that there is about $100,000.00 of equity in the farm property (both real and personal property), the Bank's risk of loss appears to be minimal in this case.

## CONCLUSION

Whether fortunately or unfortunately, it is not the duty of the Court to write (or rewrite) a plan for a debtor, and therefore the Court cannot rewrite the Debtors' Amended Plan to suit its wishes. It is incumbent on the Debtors to propose a plan that complies with all of the requirements of the Bankruptcy Code. *In re Indreland*, 77 B.R. 268, .274 (Bankr. D.Mont.1987). For the reasons set out above, the Court believes that the Debtors' Amended Plan has been filed in good faith, in a sincere attempt to successfully reorganize their financial affairs, and that the proposed plan is feasible. However, because the Amended Plan does not propose to pay the debt owed to NationsBank in accordance with the requirements of § 1225(a)(5)(B)(ii), it cannot be confirmed. If the modifications suggested by the Court in this memorandum opinion are incorporated in an amended plan, the Court believes such a plan could be confirmed.

Therefore, it is

**ORDERED** that the Objections to Confirmation filed by NationsBank and the Chapter 12 Trustee are hereby DENIED, except that the objection of NationsBank as to the interest rate provided in the Amended Plan for the note held by NationsBank and the length of time for repayment is hereby SUSTAINED. It is

**FURTHER ORDERED** that the Trustee's Motion to Dismiss is hereby DENIED. It is

**FURTHER ORDERED** that confirmation of the Debtors' Amended Plan is hereby DENIED, and the Debtors are allowed 20 days from the date of this Order to file an amended plan. Counsel for the Debtors is directed to serve any amended plan on the Chapter 12 Trustee, NationsBank,

and any other creditors and parties in interest that are adversely affected by the changes in the amended plan. Such affected parties and the Trustee will have 10 days after the filing of any amended plan in which to file written objections thereto. If objections are filed, the Court may rule on the objections without a hearing or may set a hearing if one is requested. If no objections are filed, the amended plan may be confirmed without further notice or hearing.

**SO ORDERED.**